IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ELAINE PALMER,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

No. C15-0014

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.   Palmer's Education and Employment Background . . . . . . . . . . . . 4
    B.   Vocational Expert's Testimony from Administrative
        Hearing Held on October 30, 2013 . . . . . . . . . . . . . . . . . . . . . 4
    C.   Palmer's Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . 11
    B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . . 14
        1.   Severe Impairment . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.   Treating Source Opinions . . . . . . . . . . . . . . . . . . . . 17
            a.   Dr. Taylor's Opinions . . . . . . . . . . . . . . . . 19
            b.   Dr. Safdar's Opinions . . . . . . . . . . . . . . . . 21
        3.   Vocational Expert Testimony and the DOT . . . . . . . . . . . 22

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.  ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Elaine Palmer on February 12, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Palmer asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Palmer requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's

---

[1] On March 17, 2015, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2011)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Draper v. Colvin*, 779 F.3d 556, 559 (8th Cir. 2015)

("'If substantial evidence supports the Commissioner's conclusions, th[e] court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.' *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)."); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## III. FACTS

### A. Palmer's Education and Employment Background

Palmer was born in 1954. She is a college graduate. She earned a B.A. from the University of Iowa, and paralegal and business associates degrees from Kirkwood Community College. In the past, Palmer worked as an administrative assistant, claims adjuster, customer service representative, supervisor, medical claims clerk, and legal assistant.

### B. Vocational Expert's Testimony from Administrative Hearing Held on October 30, 2013

At the administrative hearing, the ALJ provided vocational expert Julie Svec with a hypothetical for an individual who can:

> lift and/or carry, push and/or pull 20 pounds occasionally, ten pounds frequently; presume that the individual can stand and/or walk with normal breaks for six hours in an eight-hour workday; presume that the individual can sit with normal breaks for six hours in an eight-hour workday; presume that the individual can balance, climb, stoop, kneel, crouch, and crawl on an occasional basis; the individual would not be able to work in concentrated exposure to extreme cold; and the individual would be limited to no work with the public.

(Administrative Record at 66.) The vocational expert testified that under such limitations, Palmer could perform her past relevant work as an administrative assistant, supervisor, and legal assistant. As follow-up, the ALJ inquired "[i]f the individual, due to memory and judgment, would be limited to simple, routine, repetitive tasks, that would eliminate all the past work?"[2] The vocational expert responded that such a limitation would eliminate all of Palmer's past relevant work.

Palmer's attorney also questioned the vocational expert. Palmer's attorney provided the vocational expert with the following hypothetical:

> Q: Could you consider a hypothetical worker that is limited to sedentary exertional level . . . which she could have only occasional handling and fingering with her non-dominate hand and no reaching with her non-dominate arm. Could that hypothetical worker perform any of [Palmer's] past relevant work?
>
> A: The job as a customer service worker would be possible. And the job as a legal assistant . . . would be possible.
>
> Q: If we add the limitation that she would have no work with the public, is the legal assistant the only job that would remain?
>
> A: Yes.
>
> Q: And as Ms. Palmer described the legal assistant she had to interview clients. If that is the case could the job be performed as Ms. Palmer described it?
>
> A: No.
>
> Q: As she performed it?
>
> A: No.
>
> Q: If a hypothetical worker was off task up to a third of the day is she competitively employable?
>
> A: No.

(Administrative Record at 67-68.)

---

[2] Administrative Record at 66.

## C. Palmer's Medical History

On October 26, 2004, following treatment for a slip on ice in January 2004, Dr. Mark C. Taylor, M.D., provided opinions regarding permanent restrictions for Palmer. Dr. Taylor reviewed Palmer's history of injuries related to slipping on ice in January 2004:

> She did not fall but she caught herself in such a fashion that she developed leg pain and low back pain. She was attempted on a trial of conservative treatment due to her pain. She did eventually undergo surgery in April 2004.
>
> She recently saw Dr. Abernathey on 10/13/2004 at which time he stated that Ms. Palmer was at maximum medical improvement as of that date and gave her a 7% full body impairment rating.

(Administrative Record 357.) Upon treatment and review of a prior functional capacity evaluation, Dr. Taylor recommended the following permanent restrictions for Palmer: (1) the ability to move 20 pounds on an infrequent basis, 15 pounds occasionally, and 5-8 pounds on a frequent basis; (2) avoid floor to waist lifting; (3) only infrequently lift 10 pounds overhead, but the ability to lift 5 pounds occasionally, and 2-3 pounds frequently overhead; (4) have the opportunity to change positions as needed for comfort between sitting and standing; (5) sit for no longer than 30 minutes at a time without the ability to get up periodically and move around; (6) stand in place for a maximum of 40-45 minutes before needing to change positions; (7) walk up to 500 feet on level ground; and (8) infrequently (only 2-3 times per day) squat or bend. Dr. Taylor concluded that Palmer's:

> restrictions are essentially avoiding any type of heavy lifting, and she requires the ability to change positions as needed for comfort. She is not able to maintain prolonged sitting or standing positions without the flexibility to change positions. As noted in the occupational therapist's report, there is the

possibility that she may improve over time. Although at this
point, these represent permanent restrictions.

(Administrative Record at 358.)

On December 22, 2010, Palmer was referred to Dr. Chad D. Abernathey, M.D.,
regarding neck pain with radiation into both upper extremities. Dr. Abernathey noted that
Palmer's symptoms began on September 20, 2010, after experiencing a fall a work.
Conservative treatment by her primary physician failed to alleviate her symptoms. An
MRI showed "significant" disc degeneration with osteophyte formation and stenosis with
right-sided protrusion at C5-6 and C6-7. Dr. Abernathey recommended surgical
intervention. On January 26, 2011, Palmer underwent an anterior cervical diskectomy and
anterior cervical fusion with allograft at C5-6 and C6-7, performed by Dr. Abernathey and
Dr. Loren J. Mouw, M.D.

On May 19, 2011, Palmer underwent left shoulder surgery. Her preoperative
diagnoses were: partial left shoulder rotator cuff tear, torn biceps tendon (left shoulder),
and degenerative joint disease in left shoulder joint. Dr. David P. Hart, M.D., performed
a synovectomy and debridement in the left shoulder. Dr. Hart also performed a
bursectomy and distal clavicle resection. In August 2011, Dr. Hart opined that Palmer had
achieved maximum medical improvement, and placed no restrictions on the use of her left
upper extremity.

On October 26, 2011, Palmer was referred to Dr. Joe Barrash, Ph.D., for a
neuropsychology consultation. Palmer's primary neurological complaint was memory
difficulties. Specifically, Palmer reported having difficulty remembering dates and
remembering to do things. Upon testing, Dr. Barrash found that:

> Neuropsychological evaluation was most notable for impaired
> performance on multiple tests a[t] levels that were well beyond
> what could credibly be accounted for by this patient's history
> -- in the context of clearly inadequate effort. Personality
> assessment strongly indicates the presence[] of psychological

> characteristics that predispose this individual to somatic and
> cognitive complaints that are referable to psychological
> factors. Given this state of affairs, it is not possible to render
> unequivocal statements regarding the integrity of cerebral
> functioning.

(Administrative Record at 505.) Dr. Barrash recommended psychotherapy to address psychological factors affecting Palmer.

On April 19, 2012, Palmer met with Dr. Farid Manshadi, M.D., for an independent medical examination. Upon medical record review and testing, Dr. Manshadi diagnosed Palmer with left-sided neck pain, with reduced range of motion, status post anterior cervical diskectomy at C5-6 and C6-7 with instrumentation and fusion January 26, 2011; left-sided shoulder pain with reduced range of motion, status post left shoulder arthroscopic surgery May 19, 2011 for repair of rotator cuff tear and excision of left distal clavicle; and post-concussive syndrome, including difficulties with memory and concentration. Dr. Manshadi opined that Palmer has a 25 percent impairment of the left upper extremity, a 25 percent impairment to the whole person based on her neck surgery and fusion from C5 to C7 and left shoulder surgery, and a 3 percent impairment to the whole person due to her difficulties with memory. Dr. Manshadi further opined that Palmer had the following restrictions:

> I recommend she avoid any activity which requires repetitious
> reaching, shoulder level or overhead activities. I also
> recommend no lifting of more than 3 to 5 pounds with the left
> upper extremity.
>
> In regard to her neck Ms. Palmer is to avoid any activity
> which requires repetitious turning or bending or extending her
> neck.
>
> In regard to her memory issues I am in agreement with
> Dr. Westpheling to avoid any activity which requires rapid
> assimilation of new information. Ms. Palmer also may require

8

> supervision, a list of task instructions and additional visual and
> auditory cues as needed.

(Administrative Record at 536.)

On May 16, 2012, Palmer was referred by Disability Determination Services ("DDS") to David Engelstad, M.A., and Joan Jacob, M.A., for a psychodiagnostic mental status examination. In reviewing Palmer's daily activities, Engelstad and Jacob noted that:

> [Palmer] gets up at varying times during the day and night, depending on her pain level. In the morning, she showers and dresses with help from her niece or sister. . . . She needs physical assistance for dressing, food preparation, and most physical activities of the day so each activity takes extended time. . . . She stated that prior to her 2010 accident, she would read a book, "sometimes two," every day but now she does not read because she cannot remember what she has read. . . . She can sort laundry, put dishes in the dishwasher, and dust since she does not need to use both arms for these activities. She helps prepare a meal in the evening but does not have grip strength in her left hand so is limited to what she can do. . . . When asked what she does in the evening, she replied that she holds her dog. She tries to go to bed around 9:00 p.m.

(Administrative Record at 525.) On the mental status exam, Engelstad and Jacob noted that:

> [Palmer] was extremely slow in responding to basic questions. She did not know her age without asking what year it was and figuring it out. She did not recognize her phone number. . . . She would sometimes forget what she had been asked. Over the course of this 2 1/2 hour interview, she struggled to recall events, dates, and sequences, and only provided fairly basic information with limited detail. . . . [Her] mood was depressed and her affect flat. She talked of having little energy, being apathetic, feelings of being "knocked down and stomped on" and, although denying active suicidal ideation, has days when she may "wish things like if I were not here, I would not hurt[.]" She feels depressed about her physical

9

limitations, dependence on others, and constant pain. . . . She gave no evidence to suggest abnormal perception or delusional thinking.

(Administrative Record at 525-26.) Engelstad and Jacob diagnosed Palmer with major depressive disorder and dyssomnia. Engelstad and Jacob concluded that:

[Palmer] as she presented today would not appear to have the mental skills to understand and remember instructions, procedures or locations. She would not be able to sustain attention, concentration and pace. She would struggle with interaction with supervisors, coworkers and the public. She does not appear to have strong judgment at this time and would likely be incapable of responding appropriately to changes in the workplace. Her physical conditions would make successful employment unlikely.

(Administrative Record at 526-27.)

On July 16, 2012, Palmer was referred by DDS to Dr. Michael C. March, Ph.D., for an assessment of memory functioning. Palmer reported having difficulty keeping track of time, becoming disoriented in familiar places, and needing reminders to keep up her hygiene, ensure she attends appointments, and attend events. She also stated that she "does not drive much because she becomes too readily confused."[3]  Upon testing, Dr. March noted that:

There is a significant degree of variability among her individual subtest scores, from profoundly impaired to a performance in the low average range on one particular subtest. Her overall index scores were in the mild range of impairment, certainly well below expectations when considering her estimated premorbid functioning[.] . . . As noted above, there is a need for significant caution interpreting these results given the concerns regarding overall validity due to limitations in effort.

---

[3] Administrative Record at 538.

10

(Administrative Record at 540.) Ultimately, Dr. March determined that "I am unable to conclude that these scores which are normatively classified in the impaired range, are indeed a valid measure of her overall level of functioning in terms of her memory."[4]

On October 23, 2013, Dr. Ali Safdar, M.D., filled out a check-box mental functioning assessment for Palmer. Dr. Safdar found that Palmer was "markedly limited" in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Safdar also found that Palmer was "moderately limited" in her ability to interact appropriately with the general public or customers. Dr. Safdar diagnosed Palmer with major depression with psychosis. Dr. Safdar noted that Palmer had limited response to treatment. Dr. Safdar opined that Palmer could not sustain full-time competitive employment because "[h]er symptoms impair her ability to function on a sustained basis in a routine work setting."[5]

## IV.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Palmer is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014); *Young v. Astrue*, 702 F.3d 489, 490-91 (8th Cir. 2013). The five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and,

---

[4] *Id.* at 540.

[5] *Id.* at 603.

> if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014) (citing *King v. Astrue*, 564 F.3d 978, 979 n. 2 (8th Cir. 2009)); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as

age, education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Palmer had not engaged in substantial gainful activity since September 20, 2010. At the second step, the ALJ concluded from the medical evidence that Palmer had the following severe impairments: degenerative disc disease with a history of cervical fusion, and depressive disorder. At the third step, the ALJ found that Palmer did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Palmer's RFC as follows:

> [Palmer] has the residual functional capacity to perform a range of light work[.] . . . [Palmer] can lift and/or carry and push and/or pull twenty pounds occasionally, ten pounds frequently. She can stand and/or walk, with normal breaks, for a total of six hours in a workday. She can sit, with normal breaks, for a total of six hours in a workday. [Palmer] can balance, crouch, stoop, kneel, and crawl. She cannot work in environments with concentrated exposure to extreme cold. [Palmer] cannot work with the public.

(Administrative Record at 16.) Also at the fourth step, the ALJ determined that Palmer was capable of performing her past relevant work as an administrative assistant, supervisor, or legal assistant. Therefore, the ALJ concluded that Palmer was not disabled.

### B. Objections Raised By Claimant

Palmer argues that the ALJ erred in three respects. First, Palmer argues that the ALJ erred by failing to find that her left shoulder injury constituted a severe impairment. Second, Palmer argues that the ALJ erred by failing to properly evaluate the opinions of Dr. Taylor and Dr. Safdar, both treating sources. Lastly, Palmer argues that the ALJ improperly relied on vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT").

### 1. Severe Impairment

Palmer argues that the ALJ erred in her assessment at step 2 of the sequential analysis by failing to find her left shoulder injury to be a severe impairment. Palmer maintains that her treatment history, opinions of treating and consulting doctors, and her subjective complaints support a finding that her left shoulder injury constitutes a severe impairment. Palmer concludes that the ALJ's failure to consider her left shoulder injury as a severe impairment at step 2 of the sequential analysis warrants reversal.

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citations omitted). In other words, if the impairment would only have a minimal effect on a claimant's ability to work, then it would not constitute a severe impairment. *Id.* (citation omitted). The Eighth Circuit Court of Appeals has stated "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing." *Id.* at 708 (citations omitted).

In determining that Palmer's left shoulder injury is not a severe impairment, the ALJ explained her reasoning as follows:

> Evidence of record indicates [Palmer] underwent arthroscopic surgery on the left shoulder to repair a partially torn rotator

> cuff in May of 2011. Her treating doctor noted in August of
> 2011 she was at maximum medical improvement, exhibiting a
> full range of motion and no restrictions (Exhibits 2F and 4F).

(Administrative Record at 14.) Moreover, in reviewing the medical evidence in the record, the ALJ thoroughly addressed Palmer's left shoulder injury. For example, following Palmer's left shoulder surgery, the ALJ noted that:

> One week post-surgery, [Palmer] reported the pain was
> steadily improving, and it was no longer "significant" (Exhibit
> 4F, page 11). Continued improvement in the shoulder was
> noted, during a re-check appointment in July of 2011. Full
> range of motion to 150 degrees was found during an
> appointment in August 2011. Her treating doctor indicated she
> was at maximum medical improvement with no restrictions
> (Exhibit 4F, page 27).

(Administrative Record at 18.) The ALJ further noted that:

> Gradual improvement in range of motion testing was exhibited
> during physical therapy (PT) sessions as well. [Palmer]
> reported she was becoming more independent for her activities
> of daily living, including dressing herself and washing her own
> hair. She reported feeling "pretty good" in July of 2011,
> stating she was doing dishes, folding laundry, and sponge
> mopping the floor. . . . The Administrative Law Judge has
> given significant weight to [Palmer's] treating doctor who
> opined she was at maximum medical improvement and could
> return to work without restrictions, as this appears consistent
> with objective medical evidence showing [Palmer] exhibited
> gradual improvement following her arthroscopic surgery in
> May 2011. Moreover, this opinion appears consistent with
> activities of daily [] living [Palmer] was reporting at physical
> therapy.

(Administrative Record at 18-19.)

The ALJ also addressed the opinions of a consultative examiner from April 2012. The ALJ noted that at the consultative examination, Palmer reported that her left arm was "basically useless." The ALJ addressed the consultative examiner's report:

A physical examination revealed some decreased range of motion in the neck. Subjectively, [Palmer] complained of tenderness over . . . [her] left anterior shoulder[.] . . . Regarding functional limitations, [Palmer] self-reported an array of exertional and non-exertional limitations. The examiner failed to offer any functional assessment or limitations, although the diagnoses accepted [Palmer's] statements at face value. There was no report of degree of effort.

(Administrative Record at 20.)

The ALJ also addressed the opinions of Dr. Manshadi, who performed an independent medical examination. Dr. Manshadi opined that Palmer had a 25 percent impairment of the left shoulder and 25 percent impairment of the whole person. Dr. Manshadi also opined that Palmer should avoid any activity requiring repetitious reaching at shoulder level or overhead activities. Dr. Manshadi recommended that Palmer lift no more than five pounds with her left upper extremity. In granting "little" weight to Dr. Manshadi's opinions, the ALJ explained that:

the sensory examination administered by Dr. Manshadi over [Palmer's] left upper extremity was found to be intact, with a negative Tinel's sign over the left wrist and elbow, although [Palmer] had subjectively complained of numbness and tingling in her left hand. Dr. Manshadi failed to address this inconsistency in his report. Additionally, he neglected to discuss and/or assess [Palmer's] effort exhibited during testing, nor did he administer any further testing to assure integrity with the achieved results. . . . Regarding the lifting limitation of three to five pounds, this appears inconsistent with the most recent objective medical findings, dating back to August 2011, when [Palmer's] shoulder post-surgery was found at maximum medical improvement with no restrictions. There is no indication in the evidence of record that [Palmer] sought any additional treatment for her shoulder problem since that time.

(Administrative Record at 21.)

16

Lastly, the ALJ addressed a functional capacity evaluation worksheet completed by a physical therapist in August 2012. The ALJ discounted the functional capacity evaluation as follows:

> Absent from the evaluation worksheet, however, is any narrative report discussing [Palmer's] efforts during testing, or the means used to test [her] exertional levels. These two factors are considered critical in assessing and giving weight to the report, as other evidence of record has demonstrated [Palmer's] tendency not to put forth her best effort during testing (Exhibit 14F). . . . Most significantly, the suggested limitations set forth in this report are not consistent with the medical opinion evidence of record indicating [Palmer] is not as limited as she purports herself to be.

(Administrative Record at 21-22.)

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and properly addressed Palmer's medical history and treatment for her left shoulder injury. Accordingly, the Court finds that the ALJ's determination at step 2 of the sequential test, that Palmer's left shoulder injury is not a severe impairment, is supported by substantial evidence. *See Anderson*, 696 F.3d at 793. Therefore, the Court concludes that Palmer's argument on this issue is without merit.

### 2. *Treating Source Opinions*

Palmer argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Taylor, and her treating psychiatrist, Dr. Safdar. Specifically, Palmer argues that the ALJ failed to properly weigh the opinions of Dr. Taylor and Dr. Safdar. Palmer also argues that the ALJ's reasons for discounting Dr. Taylor's and Dr. Safdar's opinions are not supported by substantial evidence in the record. Palmer concludes that this matter should be remanded for further consideration of Dr. Taylor's and Dr. Safdar's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(c)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship,

(3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

### a. Dr. Taylor's Opinions

Palmer asserts that the ALJ failed to properly evaluate the opinions of Dr. Taylor, a physician who followed Palmer for approximately ten months after she slipped on ice in January 2004. There is no indication in the record that Dr. Taylor treated Palmer after October 2004. As the Commissioner correctly points out in her brief, Dr. Taylor offered his opinion nearly six years before Palmer's alleged onset date. Moreover, in that six-year period, Palmer returned to work as a project assistant at a finance company, healthcare claims representative, customer service worker, claims adjustor at an insurance company, and an administrative assistant.[6] Indeed, in his report, Dr. Taylor acknowledged that "there is the possibility that she may improve over time," which apparently she did, as she was able to return to work at a substantial gainful activity levels after 2004.[7] The Commissioner also correctly points out that Dr. Taylor improperly relied on a functional report by an occupational therapist, where the occupational therapist determined Palmer's

---

[6] *See* Administrative Record at 285.

[7] *Id.* at 358.

effort to be "inconsistent."[8] In her decision the ALJ noted that "[o]n multiple occasions [Palmer] was found to be giving less than full effort during scheduled medical examinations and testing, causing the examining doctors to urge caution in assessing the validity of the testing results (Exhibit 1F; 7F; 12F)."[9] Thus, the ALJ correctly determined that Dr. Taylor's opinions were entitled to little weight. Specifically, the ALJ found that:

> Finally, although [Palmer] alleged disability beginning in September of 2010, the Administrative Law Judge has reviewed the entire record, including evidence prior to this date. Records indicate [Palmer] underwent a physical evaluation with Mark Taylor, M.D., at St. Luke's Hospital in October 2004. Some functional limitations were given following testing, but [Palmer] went back to work at the level of substantial gainful activity in subsequent years. The Administrative Law Judge has considered the reports that [Palmer] demonstrated inconsistent effort during testing and exhibited possible symptom magnification, as this appears to be a pattern evidenced throughout records under examination for the period in question (Exhibit 1F).

(Administrative Record at 25.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Taylor. The Court also finds that the ALJ provided "good reasons" for discounting Dr. Taylor's opinions. *See* 20 C.F.R. § 404.1527(c)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

---

[8] *See* Administrative Record at 344-54.

[9] *Id*. at 25.

### b.    Dr. Safdar's Opinions

In her decision, the ALJ addressed Dr. Safdar's opinions as follows:

> [Palmer's] treating psychiatrist at the Abbe Center, Ali Safdar, M.D., completed a functional capacity assessment on behalf of [Palmer] in October 2013, the week before the hearing. He checked boxes indicating [Palmer] would exhibit marked limitations in her ability to complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. He noted moderate limitations in her ability to interact appropriately with the general public or customers. Interestingly, Dr. Safdar left the remaining functional limitation questions on the worksheet blank. No explanation was offered as why these remaining questions were left unanswered. It is noted that [Palmer] saw the psychiatrist only on two or three occasions. On the reverse side of the worksheet, Dr. Safdar commented that [Palmer] carried diagnoses of major depression with psychosis, and she demonstrated a limited response to treatment, despite compliance. He also opined that he did not feel [she] would be capable of functioning eight hours per day, five days per w[eek] in a routine work setting on an ongoing basis, given her symptoms. Of note, Dr. Safdar again failed to answer all questions on this narrative portion of the worksheet, including questions as to how long he had treated [her] and whether or not [her] allegations seemed credible (Exhibit 16F).
>
> The Administrative Law Judge has given some weight to Dr. Safdar's limitation regarding [Palmer's] ability to work with the public, as it appears consistent with treatment records from the Abbe Center suggesting [Palmer] experiences some difficulties dealing with people. Little weight has been given to the remainder of the limitations regarding [Palmer's] inability to perform work without interruption from symptoms and ability to work a normal workweek in a normal setting, as there are no indications in the mental health treatment records suggesting any acute exacerbation of symptoms for mental health reasons. Furthermore, mental status examinations

administered throughout her course of treatment through the Abbe Center were generally unremarkable. The doctor submitted his opinions as answers to a form questionnaire. Courts have long recognized that form reports in which the source's only obligation is to fill in a blank or check off a box are entitled to less weight in the adjudicative process. . . .

(Administrative Record at 24.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Safdar. The Court also finds that the ALJ provided "good reasons" for discounting Dr. Safdar's opinions. *See* 20 C.F.R. § 404.1527(c)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *Vocational Expert Testimony and the DOT*

Palmer argues that the ALJ's ultimate disability determination is flawed because the ALJ improperly relied on vocational expert testimony that was inconsistent with the DOT. At the administrative hearing, the ALJ provided the vocational expert with a hypothetical question which set forth the following limitations:

lift and/or carry, push and/or pull 20 pounds occasionally, ten pounds frequently; presume that the individual can stand and/or walk with normal breaks for six hours in an eight-hour workday; presume that the individual can sit with normal breaks for six hours in an eight-hour workday; presume that the individual can balance, climb, stoop, kneel, crouch, and crawl on an occasional basis; the individual would not be able to work in concentrated exposure to extreme cold; and the individual would be limited to no work with the public.

(Administrative Record at 66.) Based on this hypothetical, the vocational expert testified that Palmer could perform her past relevant work as an: (1) administrative assistant, (2) supervisor, or (3) legal assistant.

22

Palmer argues that the vocational expert's testimony is flawed because Palmer's RFC, which was provided by the ALJ in his hypothetical to the vocational expert, is inconsistent with the DOT's job descriptions for administrative assistant, supervisor, and legal assistant. In other words, Palmer asserts that the ALJ's RFC places restrictions on her which are inconsistent with the DOT job descriptions, and preclude her from being able to perform the jobs of administrative assistant, supervisor, and legal assistant. Specifically, Palmer argues that:

> Although the [vocational expert] testified that her opinions were consistent with the DOT, a reading of the job descriptions in the DOT indicates they are not. The duties of these jobs, as described in the DOT, include hiring employees, advising clients, and assisting customers--duties that require interaction with the public. The ALJ's failure to resolve the conflict between the [vocational expert's] testimony and the descriptions in the DOT is reversible error.

Palmer's Brief (docket number 12) at 21.

Social Security Regulation ("SSR") 00-4p explains that in making disability determinations, the Social Security Administration relies "primarily on the DOT for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 at *2. SSR 00-4p further provides that:

> Occupational evidence provided by a VE [(vocational expert)] . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must

> resolve the conflict by determining if the explanation given by
> the VE . . . is reasonable and provides a basis for relying on
> the VE . . . testimony rather than on the DOT information.

*Id*. While SSR 00-4p clearly provides that occupation evidence provided by a vocational

expert should be consistent with occupational information contained in the DOT, the Court

cautions Palmer not to read too much into this Social Security regulation. In *Wheeler v.*

*Apfel*, 224 F.3d 891 (8th Cir. 2000), the Eighth Circuit explained that:

> 'reliance on the DOT as a definitive authority on job
> requirements is misplaced, however, for DOT definitions are
> simply generic job descriptions that offer the approximate
> maximum requirements for each position, rather than their
> range.' The DOT itself cautions that its descriptions may not
> coincide in every respect with the content of jobs as performed
> in particular establishments or at certain localities. In other
> words, not all of the jobs in every category have requirements
> identical to or as rigorous as those listed in the DOT.

*Id*. at 897 (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Here, the ALJ sought testimony from a vocational expert at the administrative

hearing. The vocational expert's opinion that Palmer could perform the jobs of

administrative assistant, supervisor, or legal assistant was based on the ALJ's hypothetical

question which incorporated the ALJ's RFC assessment for Palmer, including the ALJ's

restriction on interacting with the public. Contrary to Palmer's argument, the DOT job

descriptions for administrative assistant, supervisor, and legal assistant do not require the

worker to interact with the public. The administrative assistant job description provides

a long list of duties associated with running an office setting. The job description notes

that it "may" require the worker to greet and assist visitors, but it does not state that such

actions are required for the job.[10] Similarly, the supervisor job description provides for

interaction between the supervisor and other employees, but states nothing with regard to

---

[10] *See* DICOT 219.362-010, 1991 WL 671953.

24

interaction with the public.[11]   Finally, the legal assistant job description, like the administrative assistant and supervisor job descriptions, provides no requirement of interaction with the public.  The interactions required by the legal assistant worker are with employer attorneys and possible interactions with clients of the employer attorney.[12]  Because the ALJ provided the vocational expert with a proper hypothetical question, and the ALJ's RFC assessment for Palmer is consistent with the DOT, the Court finds that the ALJ did not err in relying on the vocational expert's testimony.  *See Gragg v. Astrue*, 615 F.3d 932. 941 (8th Cir. 2010) ("Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies."); *see also Wagner v. Astrue*, 499 F.3d 842, 854 (8th Cir. 2007) (recognizing that an ALJ may rely on the testimony of a vocational expert when making his or her findings at step four and five of the five-step sequential evaluation).  In sum, the Court concludes that Palmer's argument on the DOT consistency issue neither has merit, nor supports a remand of this matter for further consideration.

## V.  CONCLUSION

The Court finds that the ALJ's determination at step 2 of the sequential test, that Palmer's left shoulder injury is not a severe impairment, is supported by substantial evidence.  The Court also finds that the ALJ properly considered and weighed the opinions of Dr. Taylor and Dr. Safdar.  Lastly, the Court finds no error in the hypothetical questions presented to the vocational expert by the ALJ, and no inconsistency between the vocational expert's testimony and the DOT.  Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

---

[11] *See* DICOT 239.132-010, 1991 WL 645981.

[12] *See* DICOT 119.267-022, 1991 WL 647026.

## VI. ORDER

1.  The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.  Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

3.  The Clerk of Court is directed to enter judgment accordingly.

DATED this 23rd day of November, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA